UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DEBRA L. SOMERVILLE

For Online Publication Only

                              Plaintiff,

              -against-

**MEMORANDUM & ORDER**

16-CV-4253 (JMA)

CAROLYN W. COLVIN,
*Acting Commissioner of Social Security*,

                              Defendant.
------------------------------------------------------------------X
**APPEARANCES:**

Charles E. Binder
Law Offices of Harry J. Binder and Charles E. Binder, P.C.
60 East 42nd Street, Suite 520
New York, NY 10165
          *Attorney for Plaintiff*

Matthew Silverman
Assistant United States Attorney
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East, 7th Floor
Brooklyn, NY 11201
          *Attorney for Defendant*

**AZRACK, United States District Judge:**

Plaintiff Debra Somerville challenges the decision of the Acting Commissioner of Social Security, who concluded, after a hearing before an Administrative Law Judge, that plaintiff is not disabled for purposes of receiving disability insurance benefits under Title II of the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. Because the Administrative Law Judge's decision was supported by substantial evidence and applied the proper legal standards, the defendant's motion for judgment on the pleadings is GRANTED, and the plaintiff's cross-motion is DENIED.

1

# I. BACKGROUND

On March 15, 2013, plaintiff Debra Somerville filed an application for Social Security disability insurance benefits. (Tr. 167.)  She claimed an onset date of disability of February 1, 2011. (Tr. 23.)  On June 16, 2015, Somerville testified at a hearing before Administrative Law Judge Kieran McCormack (the "ALJ").   (Tr. 30.)   On July 15, 2015, the ALJ denied Somerville's claim, finding her not to be disabled.  On June 6, 2016, the Appeals Council denied Somerville's request for review.  This appeal followed.

## A.  Plaintiff's Background and Testimony

Somerville was born in 1960.  (Tr. 289.)  In 1999, she was diagnosed with myasthenia gravis,[1] an autoimmune disorder. (Tr. 289.)  That year, she was hospitalized for nine weeks, and was intubated as a result of her illness.  (Tr. 289.)

Apart from myasthenia gravis, Somerville suffers from hypertension, and knee problems including degenerative disease of the right knee and osteoarthritis of the left knee.  (Tr. 25, 26, 54–54, 292, 332–343.)

---

[1] According to the National Institute of Neurological Disorders and Stroke:

> Myasthenia gravis is a chronic autoimmune neuromuscular disease that causes weakness in the skeletal muscles, which are responsible for breathing and moving parts of the body, including the arms and legs. . . .
>
> The hallmark of myasthenia gravis is muscle weakness that worsens after periods of activity and improves after periods of rest.  Certain muscles such as those that control eye and eyelid movement, facial expression, chewing, talking, and swallowing are often (but not always) involved in the disorder.  The muscles that control breathing and neck and limb movements may also be affected.
>
> There is no known cure but with current therapies most cases of myasthenia gravis are not as 'grave' as the name implies.  Available treatments can control symptoms and often allow people to have a relatively high quality of life.

(Myasthenia Gravis Fact Sheet, https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Myasthenia-Gravis-Fact-Sheet.)

To treat her myasthenia gravis, Somerville takes, inter alia, Prednisone, Imuran, and Mestinon. (Tr. 319.) It appears that she has been on the same medications, with only a small variation in the dosages, since 1999. (Tr. 48–49.)

After her hospitalization in 1999, Somerville was able to work, most recently as an administrative clerk doing data entry and taking phone calls at an office of Heritage for the Blind ("Heritage") located near her home. (Tr. 41–42.) She found this job through a friend and held the job from 2004 through early 2011. (Tr. 41–42, 47.) Heritage allowed her to take breaks if she required it. (Id.) This included allowing her to leave work to rest at home if she was feeling fatigued. (Id.) She was also not required to answer the phone if she required rest. (Id.) According to Somerville, Heritage was "very accommodating." (Id.) However, she was laid off from that job in 2011. (Tr. 42.) Her dismissal was due to the fact that Heritage was downsizing; it was not due to any physical or mental problems she may have had. (Tr. 46.)

At the hearing, Somerville was asked what, if anything, had changed in her condition since she stopped working. (Tr. 67.) She responded that "maybe" it was "a little worse." (Tr. 67.)

At the hearing, Somerville described her symptoms and activities. She suffers from weakness and fatigue when she performs activities, is under stress, and is in hot weather. (Tr. 45–46.) Somerville also testified that three to four times a week, she needs to rest or nap in the middle of the day for anywhere from a half hour to an hour. (Tr. 65.) She is able to shower and dress unassisted, and prepare dinner a few nights a week. (Tr. 60–61.) Her husband assists her with the laundry and cleaning. (Tr. at 66.) She goes out daily and is able to drive short distances to the store. (Tr. 62, 203.) She testified that her illnesses prevent her from using a computer for more than an hour at a time. (Tr. at 65.)

3

Somerville went on vacation to Florida in 2012, and again in 2014. (Tr. at 58.) During these trips, Somerville would sometimes use a wheelchair.[2] (Id.)

**B. Medical Evidence**

### 1. Dr. Howard Feldman - Cardiologist

Dr. Howard Feldman, a cardiologist, first saw Somerville on March 13, 2000. Thereafter, Dr. Feldman would see Somerville roughly every two years "or sooner as needed" in relation to her myasthenia gravis and hypertension. (Tr. 292). Dr. Feldman noted in his records that Somerville reported feeling "well" in February 2011; feeling "very well" in August 2011; had no new complaints in February 2012; felt "generally well" and had no complaints in July 2012; and was "stable" in January 2013. (Tr. 248–52.) In addition to affirmatively stating that she felt well, Dr. Feldman's treatment notes do not appear to contain reports of any adverse symptoms.

After examining plaintiff on July 10, 2013, Dr. Feldman completed an undated impairment questionnaire sometime between July 2013 and October 15, 2013.[3] (Tr. 292-297; see also Def.'s Br. at 2 n. 2.) According to the questionnaire, Somerville suffers from fatigue, weakness and shortness of breath. (Tr. 292.) Dr. Feldman opined that Somerville could sit for 2-3 hours per day and stand/walk for 2-3 hours per day. (Tr. 294.) He also opined that plaintiff would be absent more than three times a month and that plaintiff's symptoms would be severe enough to "periodically"/"frequently" interfere with her attention and concentration. (Tr. 295.) Dr. Feldman found that Somerville's symptoms would likely increase if she were in a work environment. (Tr. 294.)

---

[2] Somerville testified that, while on vacation in Florida, she sometimes required a wheelchair when she went to a "park." (Tr. 24.) Although the ALJ did not explore this issue further, Somerville's reference to a "park" may refer to an amusement park such Disney World.

[3] There are no treatment notes in the record for Dr. Feldman's July 10, 2013 visit.

### 2. Dr. Robyn Wolintz - Neurologist

Dr. Robyn Wolintz, a neurologist, began treating Somerville for her myasthenia gravis on March 30, 2005. (Tr. at 271.) Somerville sees Dr. Wolintz every six months. (Tr. 289.)

   *i. Treatment Notes*

In February 2011, Somerville denied dysphasia and difficulty swallowing.[4] (Tr. 319.) Dr. Wolintz's February 2011 treatment notes indicate that plaintiff is "neurologically stable." (Tr. 319.) These notes contain no references to fatigue or weakness.

In August 2011, Somerville reported that she felt "good" and was doing well over the past six months with no complaints of weakness. (Tr. 314.) Somerville reported that when it is extremely hot, she found it difficult to breathe. (Tr. 314.) These notes contain no references to fatigue or weakness.

In February 2012, Somerville reported feeling "pretty good," denied weakness in her limbs and neck muscles, and had no trouble swallowing or chewing. (Tr. 313.) These notes contain no references to fatigue.

In August 2012, Somerville reported being "tired at this time because she just returned from vacation in Florida." (Tr. 308.)

On April 16, 2013, plaintiff reported being fatigued and tired "all the time because I do not stop."[5] (Tr. 307.) Dr. Wolintz's notes indicate that Somerville was "neurologically stable," but also that "her fatigue interferes with her ability to function." (Tr. 307.) At this visit, Somerville also reported pain in her foot. (Tr. 307.) As discussed in more detail below, in May

---

[4]  Plaintiff asserts that notes from the February 2011 visit indicate that she "has difficulty lifting her head from the pillow." (Pl.'s Br. at 1–2.)  However, the treatment notes appear to state that plaintiff "has no difficulty lifting her head from the pillow." (Tr. 319 (emphasis added).)  In any event, even assuming that plaintiff's interpretation of the notes is correct, the Court's ultimate conclusion would be the same.

[5]  This visit occurred one month after plaintiff filed her application for disability on March 15, 2013.

2013 Dr. Wolintz filled out impairment questionnaires and, in July 2013, she wrote a narrative letter discussing plaintiff's condition and limitations.

At a November 2013 visit, plaintiff reported "significant fatigue," trouble swallowing, and shortness of breath. (Tr. 299.) Plaintiff's physical and neurological examination showed normal findings except for 1+ deep tendon reflexes and mild visual acuity issues. (Tr. 301.)

For a November 2014 visit, Dr. Wolintz's notes indicate that Somerville's symptoms were "moderate" and "stable," but occurring daily. (Tr. 361.) Plaintiff also reported that she was particularly symptomatic when she is fatigued. (Tr. 361.) Dr. Wolintz's impression of Somerville was that she was "clinically stable." (Tr. 363.)

### ii. Dr. Wolintz's Impairment Questionnaires and Letters

On May 1, 2013, Dr. Wolintz filled out an impairment questionnaire in which she explains that myasthenia gravis is a lifelong condition with exacerbation and remissions. (Tr. 271.) In the questionnaire, Dr. Wolintz also indicates that plaintiff suffers from, inter alia, general fatigue, fatigability of muscles, limb weakness, difficulty speaking, and intermittent hoarseness. (Tr. 272-73.) Dr. Wolintz opined that Somerville: (1) would have to take unscheduled 30-minute breaks every few hours during the day; (2) was likely to have "good days" and "bad days"; and (3) would be out of work about two to three times per month. (Tr. 273–275.) Dr. Wolintz concluded that, in the course of an eight-hour day, Somerville could only stand or walk for approximately two hours and sit for approximately four hours. (Tr. at 272–73.) Dr. Wolintz also concluded that Somerville could not sit continuously during those four hours, and would need to get up and move around for fifteen minutes every hour. (Tr. at 273.) Dr. Wolintz indicated that plaintiff is not a malingerer.

In another questionnaire dated May 2, 2013, Dr. Wolintz gave generally similar responses.  (Tr. 281.)  However, in the May 2, 2013 questionnaire, which was requested by the SSA, Dr. Wolintz opined that Somerville had no limitations sitting.  (Tr. 281.)

 In July 2013, Dr. Wolintz drafted a letter setting out plaintiff's diagnosis, symptoms, and limitations in narrative form.  (Tr. 289.)  This letter reiterates many of Dr. Wolintz's earlier points, but discusses plaintiff's history, symptoms and medications in greater depth.  (Tr. 289.)  Dr. Wolintz recounts how Somerville was hospitalized in 1999, but that "since that time, she has been doing quite well and has not required hospitalizations for her myasthenia gravis . . . ."  (Tr. 289.)  Dr. Wolintz notes that Somerville "continues to experience fatigue . . . [which] prevents her from working many hours straight," and that she is required to take frequent breaks because of the fatigue.  (Tr. 289.)  The letter also states that there was "fatigability during the examination with weakness as [plaintiff] performed repetitive movements."  (Tr. 289.)  In the letter, Dr. Wolintz ultimately concludes that Somerville "cannot perform full-time competitive work because of excessive fatigue, intermittent double vision, and fatigability with regards to muscle strength."  (Tr. 289.)

After the ALJ denied plaintiff's claim in July 2015, Dr. Wolintz submitted an additional narrative letter, dated January 4, 2016, which Somerville provided to the Appeals Council.  In the letter, Dr. Wolintz indicated that Somerville has "stayed relatively stable," but continues to suffer from chronic muscle fatigue that was reproducible on examination as demonstrated by weakness with repetitive movements.  (Tr. 378.)  Dr. Wolintz opined that Somerville's muscle fatigue and weakness prevented her from using public transportation or driving more than short distances.  (Tr. 378.)  Additionally, Dr. Wolintz reported that Somerville's symptoms prevented her from engaging in conversation that lasted more than 30 minutes and that it was "exhausting"

for Somerville to shower.  (Tr. 378.)  Dr. Wolintz also observed that Somerville's most recent job was sedentary in nature and that she was given special accommodations that allowed her to go home to rest and lie down as needed.  (Tr. 378.)  According to Dr. Wolintz, despite plaintiff's best efforts, she has been unable to find another job that could accommodate her needs for proximity to home, frequent rest breaks, self-paced productivity, limited repetitive movements and limited conversation.  (Tr. 378.)  Ultimately, Dr. Wolintz concluded that Somerville was unable to sit, stand, speak or use a computer "for periods sufficient for reliable employment." (Tr. 379.)

### 3.  Dr. Joseph C. Yellin - Neurologist

Dr. Yellin, a neurologist, examined Somerville on November 4, 2015 after the ALJ's adverse decision.  (Tr. 373.)

Dr. Yellin completed a disability impairment questionnaire that listed various symptoms and limitations and indicated that plaintiff suffered from those symptoms and limitations going back to February 2011.  (Tr. 373–377.)  Dr. Yellin diagnosed Somerville with myasthenia gravis, cardiac arrhythmia, and knee arthritis.  (Tr. 373.)  According to Dr. Yellin, plaintiff's primary symptoms included fatigue and hoarseness.  (Tr. 374.)  Dr. Yellin determined that Somerville would be able to sit for two-to-three hours in an eight-hour workday, and stand or walk for less than an hour. (Tr. at 375.)  Dr. Yellin also opined that her symptoms were frequently severe enough to interfere with her attention and concentration, and that she would miss more than three days of work per month.  (Tr. 376–77.)

Dr. Yellin also authored a report detailing his review of plaintiff's previous medical records, his examination of plaintiff as well as diagnosis and findings.  (Tr. 8–10.)  In the report, Dr. Yellin concluded that Somerville is "disabled and is not able to work; due to the fluctuating

course of [her] disease and the potential for exacerbation of disease associated with her employment." (Tr. 10.) Unlike the impairment questionnaire, Dr. Yellin's report did not specify the time period covered by the conclusions and findings set forth in the report.

Dr. Yellin's report was submitted to the Appeals Council, along with the rest of the record. (Pl.'s Br. at 7.)

### 4. Dr. Steven Ravitch – Orthopedic Surgeon

Dr. Ravitch, an orthopedic surgeon, treated plaintiff multiple times between November 2010 and September 2012 for issues with both her knees, including moderate arthritis, decreased motion, joint tenderness and slightly antalgic gait. (Tr. 332–343.) In 2011, Dr. Ravitch administered injections of Depo-Medrol to both knees. (Tr. 340–41.) In September 2012, Somerville saw Dr. Ravitch again for right knee pain. (Tr. 336.) After an MRI exam revealed various knee problems including avascular necrosis, Dr. Ravitch recommended knee surgery. (Tr. 332–33.) Dr. Ravitch did not submit an impairment questionnaire or opine on any work-related limitations.

### 5. Dr. Ted Woods – Consultative Examination

Dr. Woods examined Somerville on July 1, 2013, upon a referral for an examination by the New York State Division of Disability Determination Services. (Tr. 284.) Dr. Woods diagnosed myasthenia gravis, hypertension, diabetes, hearth arrhythmias, bilateral knee pain, and bilateral carpal tunnel syndrome, all by history. (Id.) The only limitation identified by Dr. Woods was a "mild limitation for kneeling and climbing stairs." (Id.) It does not appear that Dr. Woods reviewed any medical records.

## C. **The ALJ's Decision**

The ALJ found that plaintiff had severe impairments of myasthenia gravis, degenerative disease of the right knee, and osteoarthritis of the left knee.  (Tr. 22.)  The ALJ, however, concluded that these impairments did not meet or equal any of the listed impairments that would automatically render plaintiff disabled.  (Tr. 23.)  The ALJ then addressed plaintiff's residual functional capacity ("RFC").  An RFC determination identifies what work a claimant can still perform, despite her limitations.  See 20 C.F.R. § 404.1545.  The ALJ found that Somerville had the residual functional capacity to perform "light work" except that she could only climb ladders, ropes, or scaffolds on an occasional basis.  (Tr. 26.)

In making this RFC determination, the ALJ accorded significant weight to the report of Dr. Woods because it was consistent with the findings made during Dr. Woods' examination of plaintiff.  (Tr. 28.)  However, the ALJ accorded "little weight" to the reports of Drs. Feldman and Wolintz.  (Tr. 28.)  The ALJ explained that Dr. Feldman's opinion concerning Somerville's limitations is "inconsistent" with his treatment records.  (Tr. 28.)  The ALJ also found that Dr. Wolintz's opinion was contradicted by Dr. Wolintz's treatment records, which indicated that Somerville had been doing well since hospitalization, in addition to Somerville's own statements to Dr. Wolintz about how she felt.  (Tr. 28.)  Further, the ALJ determined that Somerville's claims regarding her symptoms were "not wholly credible."  (Tr. 28.)  The ALJ emphasized that Somerville cooks, cleans, and does laundry occasionally, goes outside daily, is able to drive a car, and regularly reports to her doctors that she feels fine.  (Tr. 28.)  He also stressed the medical records reveal that her medications have been relatively effective in controlling her symptoms.  (Tr. 28.)

In light of his RFC determination, the ALJ found that Somerville "is capable of performing past relevant work as an administrative clerk," and thus, was not disabled. (Tr. 29.)

## D. Appeals Council

Plaintiff requested review of the ALJ's decision by the Appeals Council. The Appeals Council denied Somerville's request for review of the ALJ's decision on June 6, 2016, finding that the record "does not provide a basis for changing [the ALJ's] decision." (Tr. 1–2.) The Appeals Council accepted Dr. Yellin's impairment questionnaire into the record, but refused to accept Dr. Yellin's report because the ALJ's decision only concerned Somerville's alleged disability through July 15, 2015, and the Appeals Council concluded that information in the report is about a later time. (Tr. 2.)

## II.  DISCUSSION

## A. Legal Standards

### 1. Standard for Entitlement to Disability Benefits

Under the Social Security Act, disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential process to determine whether an individual is disabled. C.F.R. § 404.1520. The Commissioner must determine:

(1) whether the claimant is working, (2) whether the claimant has a 'severe impairment,' (3) whether the impairment is one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, (4) whether the claimant is capable of continuing in her prior type of work; and (5) whether there is another type of work the claimant can do.  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  The instant case turns on the ALJ's determinations concerning the fourth step of this process.  At the fourth step, the Commissioner determines the plaintiff's RFC and whether the plaintiff can still do her past relevant work.    20 C.F.R. § 404.1520(a)(4)(iv).  The claimant has the burden of proving the requirements of the first four steps.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  If the claimant meets her burden, the burden of proof then shifts to the Commissioner to prove that there is other "work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

## 2. Standard of Review

In reviewing a denial of disability benefits by the Social Security Administration ("SSA"), it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Perez, 77 F.3d at 41 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d

Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation, but will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990).  An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

Generally, when a reviewing court is unable to "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [the reviewing court] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'"  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).  On the other hand, in some circumstances, remand may not be necessary even if an ALJ's decision does not explicitly address certain pieces of evidence or factors set out in the SSA's regulations, or the decision's findings or analysis on certain issues are relatively limited.  Generally, remand is not required where the ALJ's decision is specific enough to allow for meaningful review by courts, such that the decision and record allow a reviewing court to glean the rationale of the ALJ's decision and indicates that the ALJ considered all relevant evidence.  See, e.g., Mongeur,722 F.2d at 1033  ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."); Cichocki, 729 F.3d at 177 (holding that an ALJ's failure to conduct a complete function-by-function analysis as part of an RFC determination does not require remand where the ALJ's analysis "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence").

## B.  Plaintiff's Arguments

Plaintiff argues that the ALJ did not properly weigh the medical evidence and failed to properly evaluate Somerville's credibility and determine her RFC.  Plaintiff also argues that Dr. Yellin's submissions, which were provided to the Appeals Council, require remand.

## C.  Consideration of the Medical Opinions

### 1.  Standard for Evaluating the Opinions of Treating and Consultative Physicians

An ALJ's decisions regarding the weight to be accorded to each medical opinion in the record and how to reconcile conflicting medical opinions is governed by the treating physician rule.  20 C.F.R. § 404.1527(c).[6]

According to the treating physician rule, if a treating physician's opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ will credit that opinion with "controlling weight." 20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).  The treating physician rule gives "deference to the opinions of treating physicians based on the view that opinions based on a patient-physician relationship are more reliable than opinions based, say, solely on an examination for purposes of the disability proceedings themselves."  Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

---

[6] In 2017, new SSA regulations came into effect.  The newest regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because plaintiff's claim was filed in 2013, the Court applies the regulations that were in effect at the time of filing.  See, e.g., Ogirri v. Berryhill., No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Social Sec., No. 16–CV–9500, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

If a treating physician's opinion is not given controlling weight, the ALJ must consider

various factors in determining how much weight to give the opinion, including:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship;
>
> (ii) the evidence in support of the physician's opinion, including any medical signs, laboratory findings, and supporting explanations provided by the physician;
>
> (iii) the consistency of the opinion with the record as a whole;
>
> (iv) whether the opinion is from a specialist; and
>
> (v) any other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c); Halloran, 362 F.3d at 32.  An ALJ is required to give "good

reasons" in support of her determination on the weight given to a treating physician's opinion,

and the failure to provide "good reasons" for not crediting the opinion is grounds for remand.

See Schaal v. Apfel, 134 F.3d 496, 503–04 (2d Cir. 1998).

Because the opinions of consultative physicians are not subject to the treating physician

rule, such opinions are not entitled to presumptive weight.  See 20 C.F.R. § 404.1527(c); see also

Pereya v. Comm'r of Soc. Sec., No. 13-CV-173, 2014 WL 4105296, at *8 (N.D.N.Y. Aug. 20,

2014).  Nevertheless, ALJs must still consider the findings of consultative physicians.  20 C.F.R.

§ 404.1527(c).  Consultative medical opinions are evaluated using the same factors that are used

to weigh and evaluate the opinions of treating physicians.  20 C.F.R. §§ 404.1527(c)(2)–(6), see

also § 404.1527(e)(2)(ii).

### 2. Analysis

Plaintiff argues that the ALJ erred by rejecting opinions from Somerville's treating

doctors in favor of Dr. Woods, a consultative examiner.  Plaintiff contends that the ALJ

improperly substituted his lay interpretation of Dr. Wolintz and Dr. Feldman's findings and

failed to identify substantial evidence contradicting the opinions of the treating doctors.  Plaintiff maintains that her statements in the medical records that she felt "fine" and the notations in the records that she was "stable" say nothing about her ability to engage in work activities and are insufficient to justify the ALJ's decision.  Plaintiff also argues that the ALJ erred in relying heavily on the opinion of Dr. Woods, a one-time consultative examiner who did not even review Somerville's treatment notes and other medical records and who, unlike Dr. Wolintz, was not a specialist.

The Count concludes that it was permissible for the ALJ to accord the opinions of Drs. Wolintz and Feldman little weight based on the numerous inconsistencies between their treatment records and their opinions concerning Somerville's limitations.  Dr. Feldman's treatment records indicate that plaintiff was feeling well and contain no reports of adverse symptoms.  Similarly, in many of Dr. Wolintz's notes, plaintiff reported feeling well and affirmatively denied various adverse symptoms.  A number of Dr. Wolintz's notes also contain no mention of fatigue and weakness, which appear to be the primary bases for Dr. Wolintz's opinions about plaintiff's limitations.  The ALJ also relied on the fact that Dr. Wolintz's treatment notes indicate that plaintiff's physical examinations were normal.[7]  All of these inconsistencies, along with Dr. Woods' examination,[8] constitutes substantial evidence, which supports the ALJ's decision to accord little weight to the opinions of Drs. Feldman and Wolintz.

Finally, the Court notes that Dr. Wolintz's January 2016 letter, which was not before the ALJ, does not even attempt to explain the inconsistences between her opinions and her treatment notes that were central to the ALJ's decision.

---

[7] Plaintiff does not point to any treatment notes indicating that physical examinations were abnormal.

[8] Although Dr. Woods was not a specialist and did not review plaintiff's medical records, it was permissible for the ALJ to accord Dr. Woods' opinion significant weight in light of the consistency of his opinion with his examination.

**D. Credibility Analysis**

Plaintiff argues that the ALJ's credibility analysis and ultimate RFC determination were deficient.

"The ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of her pain and other subjectively perceived conditions and her resulting limitations." Baron v. Astrue, No. 11-CV-4262, 2013 WL 1245455, at *27 (S.D.N.Y. Mar. 4, 2013) (report and recommendation), adopted by, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013). "Social Security regulations provide a two-step process for evaluating symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness." Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013). "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms." Id. "If so, the ALJ 'must then evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." Id. (quoting 20 C.F.R. § 416.929(c)(1)). "[I]f a claimant's statements about his or her symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." Id. at 76. In doing so, the ALJ considers:

 (i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;

> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve pain or other symptoms
> ...; and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due
> to pain or other symptoms.

Id. (quoting 20 C.F.R. § 416.929(c)(3)).  "The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'"  Id. (quoting SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996)).  "While it is 'not sufficient for the [ALJ] to make a single, conclusory statement that' the claimant is not credible or simply to recite the relevant factors, [SSR 96–7p, 1996 WL 374186, at *2], remand is not required where 'the evidence of record permits [the reviewing court] to glean the rationale of an ALJ's decision.'"  Id. (quoting Mongeur, 722 F.2d at 1040).

In his decision, the ALJ concluded that although plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her testimony about her allegedly "debilitating symptoms" was "not entirely credible" given her testimony about her daily activities, her relatively infrequent trips to doctors, and the medical records showing that her medications have been "relatively effective in controlling the claimant's symptoms."  (Tr. 28.)

Plaintiff challenges the ALJ's credibility finding and RFC determination in various respects.  (See Pl.'s Br. at 16–17.)  None of these arguments are persuasive.

First, although the ALJ noted that Somerville had relatively infrequent trips to the doctor, (Tr. 28), this was just one fact among many that the ALJ relied on, and his analysis does not suggest that he placed undue weight on this point.

18

Second, although the ALJ noted that Somerville was clinically stable, (Tr. 28), the ALJ did not place undue weight on this point or suggest that this fact alone meant that she was not disabled. Moreover, the stability of her condition was a relevant fact, particularly since she had worked until being laid off in 2011 and even her own testimony indicated that there was little change in her condition since then.

Third, plaintiff argues that it was improper for the ALJ to rely on her testimony about her daily activities because that testimony indicated that plaintiff performed only limited activities and did not show that she could work a full-time job. The Court is not persuaded by this argument. Plaintiff's testimony about her daily activities was probative and, again, this was not the only evidence that the ALJ relied on in ultimately finding plaintiff not be disabled. The ALJ also stressed, inter alia, that plaintiff's medical records showed that her medications were relatively effective in controlling her symptoms. The treatment notes of Drs. Wolintz, Feldman, and Ravitch, along with the other evidence cited by the ALJ, provided substantial evidence to support the ALJ's credibility finding and RFC determination.

Finally, plaintiff argues that the ALJ erred because, in addressing her credibility and determining her RFC, the ALJ allegedly considered plaintiff's knee problems in isolation and did not consider the impact of that impairment in combination with her myasthenia gravis. The Court disagrees. The ALJ adequately considered both of plaintiff's impairments. The ALJ acknowledged that her knee problems caused some limitations and incorporated those limitations into the RFC. Plaintiff relies on Burgin v. Astrue, 348 Fed. App'x 646, 647 (2d Cir. 2009), but that case is clearly distinguishable. In Burgin, the plaintiff suffered from major depression and bipolar disorder, but the ALJ failed to mention the bipolar disorder in determining her RFC. Moreover, the ALJ in Burgin failed to consider the combined impact of both of the impairments

19

on the plaintiff's "social functioning, concentration, persistence, or pace, all of which were important factors in determining whether [the plaintiff] could engage in substantial gainful activity." Id. at 648. Here, the plaintiff's knee problems and myasthenia gravis were discrete impairments that generally affected different alleged limitations. The ALJ considered the impact of both impairments in his RFC determination and more explicit findings were not required here.

**E. Dr. Yellin's Submissions to the Appeals Council Do Not Warrant Remand**

Plaintiff raises two arguments concerning the questionnaire and report authored by Dr. Yellin, asserting that these submissions require remand.

First, plaintiff contends that the Appeals Council erred in not considering Dr. Yellin's report. Plaintiff asserts that, contrary to the Appeals Council's determination, the report did concern plaintiff's condition before July 15, 2015, the date of the ALJ's decision. The Court finds that the Appeals Council did not err in excluding the report because the report, which was largely based on an examination that post-dated the ALJ's decision, never explicitly stated that its findings covered the time period prior to July 15, 2015. In fact, the "Impression" section of Dr. Yellin's report is phrased in the present tense. Although the Appeals Council considered Dr. Yellin's impairment questionnaire—presumably because the questionnaire explicitly stated it covered symptoms and limitations going back to the 2011—the admission of the impairment questionnaire did not also require the Appeals Council to consider Dr. Yellin's report.

Second, plaintiff asserts that Dr. Yellin's impairment questionnaire and report "provides a reasonabl[e] basis for changing the ALJ's decision as it confirms the reports from the treating doctors and . . . there is a lack of substantial evidence contradicting such findings." (Pl.'s Br. at 19.) Even taking into account Dr. Yellin's questionnaire (either alone or in conjunction with the excluded report), there was still substantial evidence in the record to support the ALJ's decision.

See Hannon v. Comm'r of Soc. Sec., No. 15 CIV. 4035, 2016 WL 3369619, at *12 (S.D.N.Y. June 17, 2016) ("Because the new evidence submitted by [plaintiff's] physicians does not materially alter the balance of information in the record, it provides no basis for disturbing the ALJ's decision."). Although Dr. Yellin's submissions confirmed Dr. Wolintz's opinion, neither of Dr. Yellin's submissions spoke to the critical issue underlying the ALJ's decision, namely, the inconsistencies between the treatment notes and the opinions of Drs. Wolintz and Feldman. Thus, contrary to plaintiff's suggestion, (see Pl.'s Br. at 19), there is not a reasonable possibility that Dr. Yellin's impairment questionnaire (or even the questionnaire combined with the report) would have caused the ALJ to decide the claim differently. Finally, Dr. Yellin's impairment questionnaire—the only submission from Dr. Yellin properly before the Appeals Council—cited, in conclusory fashion, "medical record review" as the clinical and laboratory findings that purportedly supported his opinion. Given all of the weaknesses in Dr. Yellin's submissions, remand is not appropriate here.

## IV. CONCLUSION

For the foregoing reasons defendant's motion for judgement on the pleadings is GRANTED and plaintiff's cross-motion for judgement on the pleadings is DENIED. The Clerk of Court is directed to enter judgment in favor of defendant.

Dated: March 31, 2018
Central Islip, New York

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE